# In the United States Court of Federal Claims

Consolidated Nos. 19-496C & 24-402C
(Filed: June 30, 2025)
**FOR PUBLICATION**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| ACADIANA MANAGEMENT GROUP, LLC, *et al.*, | \* |
| | \* |
| | \* |
| Plaintiffs, | \* |
| | \* |
| v. | \* |
| | \* |
| THE UNITED STATES, | \* |
| | \* |
| Defendant. | \* |
| | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| JOHNS MANVILLE CORPORATION, | \* |
| | \* |
| Plaintiff, | \* |
| | \* |
| v. | \* |
| | \* |
| THE UNITED STATES, | \* |
| | \* |
| Defendant. | \* |
| | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Bradley L. Drell*, Gold, Weems, Bruser, Sues & Rundell, APLC, Alexandria, LA for Plaintiffs Acadiana Management Group, LLC, *et al*. With him on the briefs was *Heather M. Matthews*, Gold, Weems, Bruser, Sues & Rundell, APLC, Alexandria, LA.

*Shane Ramsey*, Nelson Mullins Riley & Scarborough LLP, Nashville, TN for Plaintiff Johns Manville Corporation.

*Eric E. Laufgraben*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant. On the briefs with him were *Claudia Burke*, Deputy Director, *Patricia M. McCarthy*, Director, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, Washington, D.C. Also on the briefs were *Andrew W. Beyer*, Trial Attorney, *Beth A. Levene*, Trial Attorney, *P. Matthew Sutko*, Associate General Counsel, *Ramona D. Elliott*, Deputy Director/General Counsel, Executive Office for United States Trustees, Department of Justice, Washington, D.C.

## OPINION AND ORDER

Plaintiff Acadiana Management Group, LLC and its co-plaintiffs in No. 19-496C are a group of debtors who seek reimbursement of quarterly fees paid as part of the Chapter 11 bankruptcy process. *See* Fourth Am. Compl. (ECF 99) (No. 19-496C). The government's motion to dismiss is fully briefed. Mot. to Dismiss (ECF 112) (No. 19-496C); Pls.' Opp. (ECF 114) (No. 19-496C); Def.'s Reply (ECF 118) (No. 19-496C). Acadiana Management Group and its co-plaintiffs also moved for certification of a class comprising similarly situated individuals and entities. *See* Pls.' Mot. for Class Cert. (ECF 97) (No. 19-496C). That motion is fully briefed as well. *See* Def.'s Resp. (ECF 113) (No. 19-496C); Pls.' Reply (ECF 115) (No. 19-496C).

Johns Manville Corp., Plaintiff in No. 24-402C, has raised an identical claim. *See* JM's Compl. (ECF 1) (No. 24-402C). The government has likewise moved to dismiss. JM Mot. to Dismiss (ECF 13) (No. 24-402C). The parties' arguments for and against dismissal are identical to those in the Acadiana Management Group case. *See* JM's Opp. (ECF 14) (No. 24-402C); JM Def.'s Reply (ECF 17) (No. 24-402C).

The two cases were consolidated for argument. *See* Acadiana Consol. Order (ECF 120) (No. 19-496C); Oral Arg. Tr. (ECF 124) (No. 19-496C); *see also* JM Consol. Order (ECF 19) (No. 24-402C). The two cases are hereby **CONSOLIDATED** for further proceedings, with *Acadiana Management Group, LLC v. United States* (No. 19-496C) designated as the lead case. All future filings should be made in the lead case. Acadiana Management Group, its co-plaintiffs, and Johns Manville Corp. will be collectively referred to as "Plaintiffs."

Because Plaintiffs' claim is foreclosed by binding precedent, the government's motions to dismiss, Mot. to Dismiss (ECF 112) (No. 19-496C); JM Mot. to Dismiss (ECF 13) (No. 24-402C), are **GRANTED**. Acadiana Management Group's motion to certify a class, Pls.' Mot. for Class Cert. (ECF 97) (No. 19-496C), is **DENIED AS MOOT**.

## BACKGROUND

The Chapter 11 bankruptcy process requires debtors to pay quarterly fees. 28 U.S.C. § 1930(a)(6)–(7). Those fees are managed under two separate systems. In most federal judicial districts, the fees are collected by the United States Trustee Program. *See* 28 U.S.C. § 1930(a)(6). But in North Carolina and Alabama, the quarterly fees are collected by the Bankruptcy Administrator Program, which is run by the Administrative Office of the United States Courts and the Judicial Conference of the United States. *See* 28 U.S.C. § 1930(a)(7); Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. No. 99-554, § 302(d)(3),

100 Stat. 3121–23; *see also Off. of United States Tr. v. John Q. Hammons Fall 2006, LLC*, 602 U.S. 487, 490 (2024).

The fees under the two systems were once identical. "Congress would set the filing and quarterly fees for U. S. Trustee districts, and then the Judicial Conference, pursuant to a standing order, would require Bankruptcy Administrator districts to match them." *Hammons*, 602 U.S. at 491.

For a few years, though, debtors in U. S. Trustee districts paid more than debtors in Bankruptcy Administrator districts. The Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, Div. B, 131 Stat. 1229 ("2017 Act"), led to a fee increase in the U. S. Trustee districts starting in 2018. *Hammons*, 602 U.S. at 491. "For reasons that remain obscure," fees in Bankruptcy Administrator districts did not increase until later. *Id.* Congress equalized the fees in 2021. *See id.*; Bankruptcy Administration Improvement Act of 2020, Pub. L. No. 116-325, § 3(d)(2), 134 Stat. 5088.

The Supreme Court unanimously held in *Siegel v. Fitzgerald*, 596 U.S. 464 (2022), that the temporary collection of nonuniform fees violated the Bankruptcy Clause of the United States Constitution, which requires that laws governing bankruptcy be "uniform." *See* U.S. Const., art. 1, § 8, cl. 4; *Siegel*, 596 U.S. at 478. But the *Siegel* Court expressly reserved the question of remedy. 596 U.S. at 481.

Two years later, in *Office of United States Trustee v. John Q. Hammons Fall 2006, LLC* — brought by debtors who paid higher fees in a U. S. Trustee district — the Supreme Court addressed the appropriate remedy. 602 U.S. at 490, 492–500. The Court identified three options reserved in *Siegel*: "(1) refund fees for those charged more in U. S. Trustee districts, (2) retroactively extract higher fees from those charged less in Bankruptcy Administrator districts, or (3) require only prospective parity." *Id.* at 492 (citing *Siegel*, 596 U.S. at 480). The Court concluded that the third option — which was already in place at the time of *Siegel* after Congress's equalization of fees in 2021 — was most appropriate. *Id.* at 490.

The Court started from the premise that the "nature of the violation determines the scope of the remedy." *Id.* at 494 (quoting *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971), and citing *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 328 (2006)). Then, turning to "the particulars of the constitutional violation we identified in *Siegel*," the Court concluded that "the violation we identified was nonuniformity, not high fees." *Id.* Because Congress undoubtably had the power to raise fees for Chapter 11 debtors, "[t]he constitutional issue arose only because [the 2017 Act] result[ed] in a disparity in fees between the two types of bankruptcy districts." *Id.* (citing *Siegel*, 596 U.S. at 468).

That meant that the disparity itself was the constitutional violation to be corrected: "Though respondents understandably complain about their higher payments, our task is not necessarily to reduce them; it is to remedy the disparity." *Id*.[1]

Having identified the violation, the Court turned to the remedy. "The touchstone for any decision about remedy," the Court began, "is legislative intent." *Id*. at 495 (alteration omitted) (quoting *Ayotte*, 546 U.S. at 330); *see also id*. at 496 ("[O]ur ultimate aim is to remedy the constitutional wrong consistent with congressional intent[.]"). The Court then identified several reasons Congress would prefer prospective parity rather than monetary refunds. Congress had shown a "commitment to higher fees in U. S. Trustee districts," and had also decided in 2021 to impose equal fees in all districts. *Id*. at 496–97. Refunds paid from the U. S. Trustee Program, meanwhile, would "transform a program Congress designed to be self-funding into an enormous bill for taxpayers." *Id*. at 498.

The Court also observed that a complete monetary refund would be impossible because many debtors that paid higher fees had ceased to exist. *Id*. Pursuing refunds for the large majority of debtors who paid higher fees would therefore have the effect of "increasing the tiny percentage of debtors — currently 2% — who paid lower fees," thus "add[ing] to the past nonuniformity" and "creating a greater overall disparity than what resulted from Congress's requirement of prospective parity." *Id*. The Court concluded that prospective parity "cures the constitutional violation, and due process does not require another result."[2] *Id*. at 504.

Unlike the *Hammons* plaintiffs, who pursued their refund claims through the bankruptcy process, the Plaintiffs in the present cases sought a refund in this Court under a Tucker Act illegal exaction theory. Fourth Am. Compl. at 3–4; JM's Compl. at 4. The government argues that although *Hammons* does not mention the Tucker Act, its reasoning implicitly forecloses that avenue of monetary recovery as well. Mot. to Dismiss 9–12; JM Mot. to Dismiss at 8–11.

## DISCUSSION

## I. <u>Jurisdiction and Standard of Review</u>

This Court's jurisdiction under the Tucker Act extends to claims seeking refunds of illegal exactions. *Boeing Co. v. United States*, 119 F.4th 17, 21, 27 (Fed.

---

[1] The Court also observed that the resulting nonuniformity was short lived and small (because 98% of debtors paid uniform fees). *Hammons*, 602 U.S. at 495.

[2] Separately, the Court addressed what it considered "[t]he only real question," namely, "whether Congress would have wanted to retrospectively impose higher fees on debtors in Bankruptcy Administrator districts." *Hammons*, 602 U.S. at 498–99. The Court concluded that Congress would not have wanted such a remedy because of its "serious practical challenges." *Id*. at 499–500.

Cir. 2024); *see also Nat'l Veterans Legal Servs. Program v. United States*, 968 F.3d 1340, 1347–48 (Fed. Cir. 2020) (explaining that illegal exaction claims are one of two types of non-contract claims over which the Tucker Act provides jurisdiction). "[T]o establish Tucker Act jurisdiction for an illegal exaction claim, a party that has paid money over to the government and seeks its return must make a non-frivolous allegation that the government, in obtaining the money, has violated the Constitution, a statute, or a regulation." *Boeing Co. v. United States*, 968 F.3d 1371, 1383 (Fed. Cir. 2020).

That standard is met here. Plaintiffs assert that their bankruptcy fees were set in a way that violated the uniformity requirement of the Bankruptcy Clause. Pls.' Opp. at 10–11; JM's Opp. at 10–11; *see Christy, Inc. v. United States*, 971 F.3d 1332, 1336 (Fed. Cir. 2020) ("An illegal exaction occurs when money is 'improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'") (quoting *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005) (itself quoting *Eastport S.S. Corp. v. United States*, 178 Ct. Cl. 599, 605 (1967) (en banc))). Their "alleg[ation] that the government has demanded and taken [their] money in violation of" the Bankruptcy Clause, "[w]hatever its ultimate merits, … suffices for jurisdiction to adjudicate the illegal exaction claim." *Boeing*, 968 F.3d at 1383.

The question, rather, is whether Plaintiffs have stated "a claim upon which relief can be granted." RCFC 12(b)(6). This Court's Rule 12(b)(6) contemplates motions "challeng[ing] the legal theory of the complaint," leading to dismissal of "actions that are fatally flawed in their legal premises and destined to fail." *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993); *see also Health Republic Ins. Co. v. United States*, 161 Fed. Cl. 510, 517 (2022); *Hicks v. United States*, 118 Fed. Cl. 76, 85 (2014).

## II. <u>Merits</u>

### A. The Nature of an Illegal Exaction Claim

The premise of an illegal exaction claim is that "[w]hen the government has the citizen's money in its pocket, the Tucker Act permits suit to recover the money exacted." *Nat'l Veterans Legal Servs. Program*, 968 F.3d at 1348 (internal quotes deleted) (quoting *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996) (itself quoting *Clapp v. United States*, 127 Ct. Cl. 505, 512 (1954))). To plead an illegal exaction claim, a plaintiff must allege (1) the government collected the plaintiff's money based on an asserted statutory power, (2) the collection violated the law, and (3) a refund remedy is necessarily implied. I elaborate on those elements as follows.

First, an illegal exaction claim encompasses scenarios where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." *Ont. Power Generation, Inc. v. United States*, 369 F.3d 1298, 1301 (Fed. Cir. 2004) (quoting *Eastport S.S. Corp.*, 178 Ct. Cl. at 605). "An illegal exaction claim must be based on property *taken* from the claimant, not property left *unawarded* to the claimant[.]" *Lummi Tribe of the Lummi Rsrv., Wash. v. United States*, 870 F.3d 1313, 1319 (Fed. Cir. 2017); *see Dillon Tr. Co. LLC v. United States*, 162 Fed. Cl. 708, 716 (2022) ("An illegal exaction claim presupposes an exaction."). The government must have collected the funds "based on an asserted statutory power." *Aerolineas Argentinas*, 77 F.3d at 1573 (citing *Eastport S.S. Corp.*, 178 Ct. Cl. at 605).

Second, the government must have violated the law by collecting the money.[3] Thus, an illegal exaction claim must allege that the money was "collected in the 'absence of statutory authorization,'" *Nat'l Veterans Legal Servs. Program*, 968 F.3d at 1348 (quoting *Aerolineas Argentinas*, 77 F.3d at 1579 (Nies, J., concurring)), or through a statute's improper use, *id.* (citing *Ont. Power Generation*, 369 F.3d at 1301), or otherwise "in contravention of the Constitution, a statute, or regulation." *Eastport S.S. Corp.*, 178 Ct. Cl. at 605.

Third — and most important for these cases — a claimant must demonstrate that "the statute or provision causing the exaction itself provides, either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted.'" *Norman*, 429 F.3d at 1095 (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000)). The plaintiff need not identify the kind of money-mandating law necessary for other Tucker Act claims in this Court. *See Boeing*, 968 F.3d at 1384; *V.I. Port Auth. v. United States*, 136 Fed. Cl. 7, 14 (2018) ("Plaintiff need not point to a money-mandating provision, because the necessary remedy to the government improperly using its authority to place a citizen's money in its pocket is a return of that sum.") (internal quotations omitted) (citing *Aerolineas Argentinas*, 77 F.3d at 1572–74), *aff'd*, 922 F.3d 1328 (Fed. Cir. 2019). But it must show that a refund is the remedy.

## B. The Effect of *Hammons*

The obvious problem for Plaintiffs is the Supreme Court's holding in *Hammons* that the constitutional wrong of nonuniformity was fully remedied by prospective

---

[3] An illegal exaction thus involves a deprivation of property without due process of law in violation of the Due Process Clause of the Fifth Amendment. *Norman*, 429 F.3d at 1095. Though the Tucker Act does not ordinarily provide this Court with jurisdiction over due process claims, illegal exactions are an exception because that exaction is based on "an asserted statutory power." *Id.* (quoting *Aerolineas Argentinas*, 77 F.3d at 1573).

equality. *See* 602 U.S. at 496. Although Plaintiffs aim to distinguish that holding in various ways, it forecloses their claims.

Plaintiffs' main argument is that although *Hammons* precludes monetary recovery directly from bankruptcy proceedings, it does not apply to recovery in this Court under an illegal exaction theory. Pls.' Opp. at 18–20; JM's Opp. at 19–20. But although *Hammons* does not mention this Court, illegal exactions, or the Tucker Act, it covers Plaintiffs' exaction claim by negating one of its elements.[4]

As just mentioned, prevailing on an illegal exaction theory means proving that a refund is the implied remedy. *Norman*, 429 F.3d at 1095. Yet the *Hammons* Court explained — repeatedly — that the remedy of "uniform fees going forward … cures the constitutional violation." 602 U.S. at 504; *id.* at 500 ("Here, Congress would have wanted prospective parity, and that remedy is sufficient to address the small, short-lived disparity caused by the constitutional violation we identified in *Siegel*."). Most importantly, prospective parity effected a "cure[]" even though it left debtors "understandably complain[ing] about their higher payments." *Id.* at 494, 504.

If the remedy the Court settled on provides a "sufficient" remedy that "cures" the constitutional violation — even though the Court knew the government would not pay a refund — then the additional remedy of a refund cannot have been implied as well. *See id.* at 500, 504. And when an element of a claim is ruled out as a matter of law, the claim must be dismissed. *Allen v. United States*, 100 F.3d 133, 135 (Fed. Cir. 1996) ("[Plaintiff's] failure to prove an element of his cause of action simply means he failed to state a claim upon which relief can be granted.") (citing *Gould, Inc. v. United States*, 67 F.3d 925, 929–30 (Fed. Cir. 1995)); *Brockmeier v. United States*, No. 21-917C, 2021 WL 2555489, *2–3 (Fed. Cl. June 22, 2021) (concluding that as a matter of law, the plaintiff could not plead an element of his claim and therefore dismissing the complaint).

That is somewhat counterintuitive, given that the government collected bankruptcy court fees in a constitutionally flawed way. But — to come at the same point from another direction — the *Hammons* Court explained that the problem was the fees' nonuniformity, not that they were too high. 602 U.S. at 494. That meant that although the constitutional defect originated in Congress's decision to raise the fees in U. S. Trustee districts, the Court's remedial purpose was "not necessarily to reduce them[,] [but] to remedy the disparity." *Id.* Somewhat paradoxically, because

---

[4] These cases are thus unlike ones where plaintiffs plead the elements of claims within this Court's jurisdiction, after which their entitlement to damages should be resolved on the merits rather than on the pleadings. *See* Pls.' Opp. at 10 (citing *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1371 (Fed. Cir. 2021)); JM's Opp. at 10 (same).

Congress's power to raise fees was undisputed, *id.* at 496–99, the debtors did not suffer the injury of being charged too much — only of unequal treatment, which Congress addressed with prospective equality. That distinguishes these cases from typical examples of "the government improperly using its authority to place a citizen's money in its pocket." *V.I. Port Auth.*, 136 Fed. Cl. at 14 (quotes omitted).

Plaintiffs have various responses, but none changes the result.

First, Plaintiffs seek to reframe the issue: They ask whether there is evidence that Congress intended to displace this Court's Tucker Act jurisdiction to remedy illegal exactions, and conclude that there is not. Pls.' Opp. at 14–16; JM's Opp. at 14–16. Plaintiffs' citations to authorities involving implied repeal of statutes and similar subjects are broadly correct, as far as they go. Plaintiffs are right that the Tucker Act could offer a legal remedy even when other sources of federal funding (like the U. S. Trustee Program) do not. Pls.' Opp. at 16–17; JM's Opp. at 16–17. As Plaintiffs say, the Tucker Act's remedial purposes are broad, *Slattery v. United States*, 635 F.3d 1298, 1320 (Fed. Cir. 2011) (en banc); *Kanemoto v. Reno*, 41 F.3d 641, 644 (Fed. Cir. 1994) ("The Tucker Act is a general waiver of sovereign immunity for monetary claims against the United States."); *see Ont. Power Generation*, 369 F.3d at 1301, implied repeals are disfavored, *Slattery*, 635 F.3d at 1320–21; *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 133–34 (1974) (giving effect to the Tucker Act because "repeals by implication are disfavored"); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1017 (1984) (same), and there are no other apparent means for the monetary recovery Plaintiffs seek.

But if you ask the wrong question, you get the wrong answer. Given that *availability* of a refund remedy is an element of an illegal exaction, *un*availability of that remedy here means that the elements of an illegal exaction cannot be proven as a matter of law. *Allen*, 100 F.3d at 135; *Brockmeier*, 2021 WL 2555489, at *2–3. In other words, no illegal exaction took place at all — at least within the definition applied in this Court — so there is no illegal exaction claim for Plaintiffs to bring. And if there is no illegal exaction claim to begin with, there is nothing for Congress to displace. Plaintiffs' assumption that they have an illegal exaction claim that can be brought in this Court unless Congress provides otherwise thus gets off on the wrong foot: If lack of a refund remedy means there is no illegal exaction claim, we do not need to look any further for congressional intent to foreclose the claim in this Court.

Second, Plaintiffs claim that the *Hammons* majority left some legal and factual theories unaddressed. Pls.' Opp. at 18–21; JM's Opp. at 18–21. Plaintiffs argue that the *Hammons* Court overlooked the Court of Federal Claims when it concluded that

compensation for debtors was impractical, *see* Pls.' Opp. at 18–20; JM's Opp. at 18–20, that it dismissed some arguments because they were not presented by the parties, rather than on the merits, *see* Pls.' Opp. at 20–22; JM's Opp. at 20–22, and that it adopted some arguments that the government should have been precluded from arguing at all, *see* Pls.' Opp. at 21–22; JM's Opp. at 22.

As for the presentation of arguments in *Hammons*, Plaintiffs misread the majority decision. The dissent interpreted the majority as "rest[ing] its holding today on the lack of party presentation of [certain] arguments." 602 U.S. at 515 n.4 (Gorsuch, J., dissenting). But the majority opinion specifically rejects that interpretation: "The dissent attempts, in various additional ways, to cabin, qualify, or contradict our analysis, including by wrongly suggesting that it rests on the party presentation principle. Readers are reminded that the dissent is 'just that'." *Id.* at 502 n.3 (internal citation omitted) (quoting *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 389 n.4 (2023)). It should go without saying that where the majority and dissent disagree, the majority prevails. *Ministerio Roca Solida v. United States*, 778 F.3d 1351, 1355 (Fed. Cir. 2015) ("[C]oncurring and dissenting opinions, of course, do not negate the binding nature of the majority opinion.").

More fundamentally, Plaintiffs' arguments about omissions in the *Hammons* analysis misunderstand the nature of Supreme Court precedent. A Supreme Court holding is not a starting place for lower courts to consider new arguments for why it might be wrong. Quite the opposite: It is a *finish* line for litigation in lower courts about the issues it resolves. Once the Supreme Court decides an issue, lower courts are forbidden to revisit it, even on the basis of legal or factual arguments the Supreme Court did not mention or consider. *Kehaya v. United States*, 174 Ct. Cl. 74, 78 (1966); *see also EEOC v. Trabucco*, 791 F.2d 1, 4 (1st Cir. 1986); *United States v. McKoy*, 387 F.2d 144, 145 (4th Cir. 1967); *Hendricks Cnty. Rural Elec. Membership Corp. v. NLRB*, 627 F.2d 766, 768–69 (7th Cir. 1980), *rev'd*, 454 U.S. 170 (1981); *United States v. Russell*, 461 F.2d 605, 608 (10th Cir. 1972); *United States v. Henco Holding Corp.*, 985 F.3d 1290, 1302 (11th Cir. 2021). The same rule applies more broadly to the precedential opinions of circuit courts as well. *See Agway, Inc. v. United States*, 207 Ct. Cl. 682, 696–97 (1975); *see also United States v. Barrett*, 102 F.4th 60, 82–83 (2d Cir. 2024), *cert. granted*, 145 S. Ct. 1307 (2025); *In re Penn Cent. Transp. Co.*, 553 F.2d 12, 15 (3d Cir. 1977); *Gibbons v. Gibbs*, 99 F.4th 211, 213 (4th Cir. 2024); *United States v. Wilkerson*, 124 F.4th 361, 368 (5th Cir. 2024); *United States v. Hill*, 48 F.3d 228, 232 (7th Cir. 1995); *Harris v. The Epoch Grp., L.C.*, 357 F.3d 822, 826 (8th Cir. 2004); *Silva v. Garland*, 993 F.3d 705, 717 (9th Cir. 2021); *United States v. Baker*, 49 F.4th 1348, 1358 (10th Cir. 2022); *United States v. Canario-Vilomar*, 128 F.4th 1374,

1381 (11th Cir. 2025); *cf. Hartman v. Nicholson*, 483 F.3d 1311, 1315 (Fed. Cir. 2007) (discussing an opinion of the Court of Appeals for Veterans Claims).

That is the end of Plaintiffs' new theories. Assume, *arguendo*, that Plaintiffs are right: Maybe the *Hammons* Court did overlook important arguments that could have changed the case's outcome. It still does not matter. Because the new arguments Plaintiffs raise go to the correctness of the *Hammons* Court's decision on the issues it resolved, they are off-limits from this Court's perspective. The Supreme Court can revisit them again at its discretion, but lower courts cannot.

That result might be harsh sometimes, because it means that incomplete party presentation of issues in the first case raising a particular issue can lead to a mistaken decision that binds litigants in future cases. Yet the underlying principle seems essential to the nature of legal precedent. The precedential effect of a Supreme Court decision does not extend, of course, to "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon[.]" *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). But it *does* extend to the Supreme Court's reasoning, *see Ramos v. Louisiana*, 590 U.S. 83, 125 n.6 (2020) (Kavanaugh, J., concurring in part), its "explications of the governing rules of law," *Cnty. of Allegheny v. Am. C.L. Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 668 (1989) (Kennedy, J., concurring in the judgment in part and dissenting in part), and any "preceding determinations" that are necessary to that result, *Tyler v. Cain*, 533 U.S. 656, 663 n.4 (2001) (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996)). Once the Supreme Court reaches its holding on an issue, it clears the field of potential counterarguments.

Third, Plaintiffs argue that the *Hammons* Court was incorrect on certain issues, relying extensively on the dissent. Pls.' Opp. at 18–24; JM's Opp. at 18–24. But this Court, again, is bound by the majority opinion, and cannot question its correctness. *Tri-State Materials Corp. v. United States*, 213 Ct. Cl. 1, 6 (1977) ("We are, of course, bound by the majority opinion of the Supreme Court, and not by the dissent[.]"); *see also Est. of Bunn v. United States*, 3 Cl. Ct. 547, 549 (1983) ("[T]his court is not empowered to disregard the authority of a Supreme Court decision, no matter how persuasive is the argument that it erred."); *Bonanno v. United States*, 12 Cl. Ct. 769, 771 (1987) ("It is axiomatic that this court cannot disregard the Supreme Court's legal decisions even if it is persuaded that the Supreme Court was in error."). The *Hammons* majority specifically rejected many of the dissent's arguments, 602 U.S. at 500–04, and whatever force the dissent's arguments might have had, they did not persuade the majority and cannot be relied upon to contradict the majority's decision. *See Ministerio Roca Solida*, 778 F.3d at 1355.

In short, *Hammons* conclusively established that no further relief beyond prospective parity was warranted for violation of the uniformity requirement of the Bankruptcy Clause. No refund was needed for debtors who paid higher fees. That holding rules out a remedy under the Tucker Act too. Thus, Plaintiffs' complaints should be dismissed because "the facts asserted ... do not entitle [them] to a legal remedy." *Welty v. United States*, 926 F.3d 1319, 1323 (Fed. Cir. 2019) (quoting *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)).

<u>CONCLUSION</u>

The two cases, Acadiana Management Group (No. 19-496C) and Johns Manville Corp. (No. 24-402C), are hereby **CONSOLIDATED**, with *Acadiana Management Group, LLC v. United States* (No. 19-496C) designated as the lead case.

For the foregoing reasons, the government's motions to dismiss, Mot. to Dismiss (ECF 112) (No. 19-496C); JM Mot. to Dismiss (ECF 13) (No. 24-402C), are **GRANTED**. The motion to certify a class in Acadiana Management Group, Pls.' Mot. for Class Cert. (ECF 97) (No. 19-496C), is **DENIED AS MOOT**.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED**.

s/ Stephen S. Schwartz
STEPHEN S. SCHWARTZ
Judge